UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
)
SUSAN F. BLOOM and FIDUCIARY            )
TRUST COMPANY INTERNATIONAL,            )
as Executors of the Last Will and Testament )
of ADELE KLAPPER,                       )
                                        )
          Plaintiffs,                   )
                                        )
v.                                      )          Civil Action No. 19-10155-RA
                                        )
JUAN CARLOS EMDEN, MIGUEL ERIC          )
EMDEN, and NICOLAS MARCELO              )
EMDEN,                                  )
                                        )
          Defendants.                   )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)


*Attorneys for Juan Carlos Emden, Miguel Eric
Emden, and Nicolas Marcelo Emden*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .......................................................................................................1

BACKGROUND .........................................................................................................2

      The Nazi Persecution of Retailer and Art Collector Max Emden ..................................2
      The Dissolution of the Emden Collection....................................................4
      The Plaintiffs Initiated Settlement Discussions with the Emdens ...................................7

ARGUMENT ............................................................................................................10

I.     PLAINTIFFS CANNOT ESTABLISH JURISDICTION OVER THE EMDENS ...........10

     A.     The Emdens' *De Minimus* Forum Contacts Do Not Establish Personal
            Jurisdiction Under New York Law. .................................................10

           1.     Settlement Negotiations Do Not Create Personal Jurisdiction. .................11

           2.     Discussing, and Even Asserting, Existing Rights Does Not Establish
                Personal Jurisdiction. ..................................................................13

     B.     Due Process Forbids Personal Jurisdiction Over these Chilean Defendants. ........16

II.    THE COURT SHOULD DECLINE PLAINTIFFS' REQUEST TO PREJUDGE
     THIS CASE .....................................................................................19

CONCLUSION.........................................................................................................24

# TABLE OF AUTHORITIES

# <u>CASES</u>

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
   480 U.S. 10 (1987) ..................................................................................................... 17

*AlbaniaBEG Ambient Sh.p.k. v. Enel S.p.A.*,
   160 A.D.3d 93 (N.Y. App. Div. 2018) ........................................................................ 17

*Beacon Enterprises, Inc. v. Menzies*,
   715 F.2d 757 (2d Cir. 1983) ....................................................................................... 16

*Cassirer v. Thyssen-Bornemisza Collection Foundation*,
   No CV 05-3459 (C.D. Cal.), Docket No. 621 (Apr. 30, 2019) ...................................... 21

*Columbia Pictures Indus., Inc. v. Schneider*,
   435 F. Supp. 742 (S.D.N.Y. 1977) .............................................................................. 11

*D&R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
   29 N.Y.3d 292 (N.Y. 2017) ................................................................................... 16–17

*Digi-Tel Holdings v. Proteq Telcoms.*,
   89 F.3d 519 (8th Cir. 1996) ........................................................................................ 18

*Ehrenfeld v. Bin Mahfouz*,
   9 N.Y.3d 501 (N.Y. Ct. App. 2007) ....................................................................... 15–16

*Fagan v. Republic of Austria*,
   2011 U.S. Dist. 32058 (S.D.N.Y. Mar. 25, 2011) ........................................................ 12

*Flame Mar. Ltd. v. Hassan Ali Rice Exp. Co.*,
   No. 07 Civ. 4426 (WHP), 2010 U.S. Dist. LEXIS 47041, at *8 (S.D.N.Y. May 4, 2010) ................. 11

*Glens Falls Cement Co. v. Severn Coal Co.*,
   No. 89-CV-1092, 1990 U.S. Dist. LEXIS 1609, at *18 (N.D.N.Y. Feb. 14, 1990) ........................... 11

*In re A & W Publrs.*,
   1984 U.S. Dist. LEXIS 16258 (S.D.N.Y. May 31, 1984) .......................................... 17–18

*In re Shipowners Litigation*,
   361 N.W.2d 112 (Minn. Ct. App. 1985) ..................................................................... 18

*LaPrade v. Rosinsky*,
   882 A.2d 192 (D.C. 2005) ........................................................................................... 23

*Manko v. United States*,
  87 F.3d 50, 54 (2d Cir. 1996) ....................................................................................... 22

*Marlin Firearms, Co. v. Wild West Guns, LLC*,
   2013 U.S. Dist. LEXIS 77175 (D. Conn. May 31, 2013) .............................................. 18

*Marvel Characters, Inc. v. Kirby,*
   726 F.3d 119 (2d Cir. 2013) ................................................................ 14–15

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,*
   84 F.3d 560 (2d Cir. 1996) .................................................................. 16

*Nova Biomedical Corp. v. Moller,*
   629 F.2d 190 (1st Cir. 1980) ............................................................... 18

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,*
   148 F.3d 1355 (Fed. Cir. 1988) ........................................................... 18

*Reif v. Nagy,*
   106 N.Y.S. 3d 5 .............................................................................. 6–7, 21

*Robinson v. Overseas Military Sales Corp.,*
   21 F.3d 502 (2d Cir. 1994) .................................................................. 10

*Rosenblatt v.Coutts & Co. AG,*
   750 Fed. Appx. 7 (2d Cir. 2018) ......................................................... 10, 11

*Saade v. Wilmington Sav. Fund Soc'y,*
   2017 U.S. Dist. LEXIS 154846 (D. Mass. Sep. 22, 2017) ................... 23

*Sayles Biltmore Bleacheries, Inc. v. Soft-Fab Textile Processors, Inc.,*
   440 F. Supp. 1010 (S.D.N.Y. 1977) .................................................... 11–12

*Smith Architectural Metals, L.L.C. v. Am. Railing Sys.,*
   207 N.C. App. 151 (2010) ................................................................... 12

*Tamam v. Fransabank SAL,*
   677 F. Supp. 2d 720 (S.D.N.Y. 2010) ................................................. 10

*Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape Antitrust Litig.),*
   334 F.3d 204 (2d Cir. 2003) ................................................................ 10

*Trebor Sportswear Co. v.Limited Stores, Inc.,*
   865 F.2d 506 (2d Cir. 1989) ................................................................ 22

*United States v. Gonzalez,*
   748 F.2d 74 (2d Cir. 1984) .................................................................. 22

*United States v. Portrait of Wally,*
   663 F. Supp. 2d 232, 265 n. 24 (S.D.N.Y. 2009) ................................ 22–23

*Waldman v. PLO,*
   835 F.3d 317 (2d Cir. 2016) ................................................................ 17

# STATUTES AND FEDERAL RULES

CPLR § 302 ................................................................................................................................ 10–11

Fed. R. Civ. P. 12 ...................................................................................................................... 1

Fed. R. Evid. 408 ...................................................................................................................... 2, 22

Pursuant to Fed. R. Civ. P. 12(b)(2), Defendants Juan Carlos Emden ("Juan Carlos"), Miguel Eric Emden ("Miguel"), and Nicolas Marcelo Emden ("Nicolas," together with Juan Carlos and Miguel, the "Defendants," or the "Emdens"), by their undersigned counsel, respectfully move to dismiss the Verified Complaint (the "Complaint").

## INTRODUCTION

The Emdens, Chilean citizens and residents and the grandsons of victims of Nazi persecution, have no connection to New York. They do not transact business here, nor have they targeted New York with any of their actions, or availed themselves of any of New York's laws or protections. The Complaint fails to meet the threshold of specific jurisdiction, and instead substitutes a convoluted method of obtaining jurisdiction over foreign citizens that is contrary to due process. Plaintiffs Susan F. Bloom and Fiduciary Trust Company International ("Plaintiffs") ask this Court to defy settled precedent to create a novel and unjust rule that would use a settlement discussion as a jurisdictional trap. Happily, public policy as articulated by the courts of this circuit and state forbid this draconian result. The case should end now.

Worse yet, Plaintiffs seek to compel Defendants to litigate the facts of the case without the opportunity to defend themselves in the usual course. There is no basis to brush past ordinary case management—in particular, discovery—in this case. The notion that even the one-sided facts that Plaintiffs alleged, and the exhibits Plaintiffs selected, somehow entitle Plaintiffs to a hasty judgment is misguided. The internal consistencies and myriad disputes of fact created by Plaintiffs' own offer of proof dispense with the idea that there is nothing to sort out here. If the Court were to find jurisdiction, there would be a complicated puzzle to solve concerning Nazi fellow-travelers and the laundering of stolen art in Switzerland during and after the war. In their misuse of settlement communications, Plaintiffs have at least conceded that there is no actual exigency whatsoever to this case. Plaintiffs wish to sell a valuable painting, but have stressed—

when it is to their advantage—that they are in no particular rush. So be it, then. If—and only if—the motion to dismiss were to be denied, the Emdens request that the Court schedule a status conference like in any other case to determine the management of the case. There is no cause to jump the queue.

## BACKGROUND

The Nazi Persecution of Retailer and Art Collector Max Emden

Defendants' grandfather Dr. Max James Emden ("Max"), a German persecuted as a Jew by the Nazis, owned *Le Palais Ducal*, 28.34" x 36.3/8" (the "Painting," now held by the estate of Adele Klapper[1]) until his death in 1940. Complaint, ¶ 1, 9; Complaint, Exhibit FF (Expert Report of Thomas Buomberger ("Buomberger Report"))[2]. Max was born on October 28, 1874, the son of Jakob and Mathilde (née Kann) Emden. *Id.* at 2. After earning a doctorate in chemistry and minerology, Max joined in 1904 his father's business, M. J. Emden Söhne (M. J. Emden & Sons). *Id.* In a few years Max had turned the business into Germany's leading department store. *Id.* Among other accomplishments, he was a financier of the famous KaDeWe in Berlin, the Kaufhaus des Westens, at one time one of the most famous department stores in the world. Max sold the majority of the department stores affiliated with his firm to Rudolf Karstadt AG in 1926, but he remained active at M. J. Emden Söhne after that as well. *Id.*

---

[1] The Facts as discussed herein are drawn from the papers filed with the Complaint and matters referenced therein. Defendants challenge the sufficiency of the allegations to confer jurisdiction over them, but do not concede the accuracy, authenticity, or veracity of any allegation in or document attached to the Complaint by so moving.

[2] The Buomberger Report, as explained herein, was commissioned for use in a settlement conversation and thus cannot be used as evidence against the Emdens (*see* Fed. R. Evid. 408), but since Plaintiffs improperly included settlement discussions as substantive evidence in the Complaint, the Emdens note where those discussions undermine Plaintiffs' ostensible point. The Emdens are not bound by the text of the Buomberger Report, which may not be used to show liability or the waiver of any position or defense, or for impeachment.

Max, who had converted to Protestantism back in 1893 as a young man, like many other assimilated German Jews was nonetheless viewed as a *Volljude*—a "full Jew"—after the Nazis seized power in January of 1933 and as codified in the Law for the Protection of German Blood and Honor (*i.e.*, the Nuremberg Race Laws). This was in line with Nazi laws on Jewishness and race. Thus after 1933 Max faced defamation and discrimination from both the German and Swiss authorities as a member of a persecuted group. Even his Swiss citizenship did not protect him from the measures of racial persecution and violence aimed at him and his company by the Nazi regime starting in 1933. *Id.*

The core of Max Emden's resources was his business interests, which were taken from him by Nazi persecution. *Id.* at 3. While he owned real property in Switzerland, what else remained of value was in Germany, where his homeland's racist regime forbade him from enjoying the fruits of his labors. *Id.* at 3. As the target of pogroms and boycotts, Emden risked seeing his life's work dissolve before his eyes. *Id.* at 4. While Max moved physically to Switzerland, that country's complicity in enforcing Germany's foreign currency export laws trapped his wealth in the country that was trying—and succeeding—to destroy him. *Id.* That left him to liquidate his real estate and personal property in Switzerland just to survive—the direct and proximate result of Nazi persecution and theft because all his income-producing property had been in Germany. *Id.* By the time he died in 1940, the company M. J. Emden Söhne was in the process of being liquidated, and his once-considerable private fortune of several million Reichsmarks had also been entirely used up. Specifically, he lost all his real property in Hamburg in 1935, and in 1938 the Nazi authorities in Danzig declared that he owed a fictitious tax debt as justification to seize his remaining assets. *Id.* at 6.

Max tried to enlist the Swiss authorities to help unfreeze his assets, but faced similar discrimination (the notion that Switzerland in 1938 stood apart from the anti-Semitism of Europe at the time was long ago disproved). *Id.* at 6–8. This was in sharp contrast to other non-Jewish Swiss residents who had no difficulty retrieving their property from Germany. *Id.* at 9.

In sum, due to racial persecution as a Jew and to the Nazi terror directed against him, Max Emden's life and his business livelihood were systematically destroyed by the German state after 1933. *Id.* at 11. Starting in about 1935, he did not have free access to his German assets, nor was he able to sell them at market prices, or transfer the earnings to Switzerland. *Id.*

The Dissolution of the Emden Collection

By 1937 Max Emden was seeking to realize the value of his art collection to survive. The results are illustrative. For example, in 1938, Emden sold three paintings by the Venetian painter Bellotto (a/k/a Canaletto) in a sale involving Karl Haberstock, an infamous art dealer appointed directly by Hitler. That sale was recognized this year as invalid by the German "Advisory Commission on the return of cultural property seized as a result of Nazi persecution, especially Jewish property" that makes recommendations to German state museums with respect to claims for Nazi-confiscated art. While the Advisory Commission has faced well-deserved criticism for its generally regressive view of what amounts to a forced sale,[3] even that conservative panel had no choice but to recognize that the sale of Bellotto paintings *The Zwinger Moat in Dresden* and *Karlskirche in Vienna* was invalid—despite Max's residence in Switzerland on which Plaintiffs place so much importance. *See* Explanatory statement on the recommendation of the Advisory Commission in the case of Dr. Max James Emden vs. The Federal Republic of Germany,

---

[3] Former Ambassador to Austria and current President of the World Jewish Congress Ronald Lauder has said: "No one wants to go to the Commission today because it is not viewed as independent or impartial."

attached to the Affidavit of Nicholas M. O'Donnell (the "O'Donnell Aff.") as <u>Exhibit 1</u>. As the

Advisory Commission stated:

> <u>The systematic destruction of people's economic livelihoods by the Third Reich</u>
> <u>as a tool of National Socialist racial policy (and precursor to the Final Solution)</u>
> <u>thus also applied in the case of Emden</u>. The growing financial difficulties were
> already noticeable everywhere by 1937, as his secretary and confidante, Olga
> Ammann, credibly claimed. At the end of the 1930s Emden was thus no longer
> able to pay his domestic staff and meet his obligations in Switzerland, while the
> properties on the Brissago Islands became more and more of an unmanageable
> burden. The policy of persecution pursued by the National Socialists therefore
> caused the financial ruin of Max Emden, who died in Porto Ronco on November
> 26, 1940. Consequently, <u>there is also no doubt that the sale of the aforementioned</u>
> <u>three paintings by Bernardo Bellotto to Karl Haberstock in early summer 1937</u>
> <u>was not undertaken voluntarily</u> but was entirely due to worsening economic
> hardship ("loss of assets as a result of persecution"), confirmed not least by the
> fact that Emden was forced to sell other valuable items from his household same
> time.

*Id.* (emphasis added). Few would dare argue that the chance for a fair deal *improved* between

1937 (the Bellotto sale) and the Painting's sale at issue.

The effect of all this on Max's son and heir Hans Erich is obvious—it deprived him of his

rightful inheritance. Hans Erich (himself a German by birth) was stripped of his German

citizenship in May, 1940. Buomberger Report at 14; *see also* Complaint, Exhibit V

(documentary video showing, among other things, newspaper in which the loss of citizenship of

Hans Erich and other Jews was announced). With Nazi Germany exercising total control over all

of Europe by 1940, literally surrounded by a murderous regime only a few hundred miles away,

he made the only rational choice (he had never been a Swiss citizen) and fled the continent to

South America in the spring of 1941. *Id.*

As for the Painting, the Complaint would suggest that it went in the ordinary course from

one art collector to another—and that the facts are so simple that Plaintiffs should win now. The

facts, even as known now, before discovery, say quite otherwise. The Complaint alleges it was

sold at Hans Erich's direction to Walter Feilchenfeldt. Complaint ¶ 10. The Complaint alleges

that Feilchenfeldt was agent for Hans Lütjens, but there is no evidence of this and the allegation

is on information and belief only. The Complaint attaches from the Feilchenfeldt archive what it

calls a "bill of sale" (Exhibit J) but this document raises more questions than it answers. First and

foremost, it is not a contemporaneous bill of sale; it is entitled rather a "confirmation,"

purporting to describe the paintings already sold. It is dated nearly a year after the supposed

authorization that preceded it. It does *not* say to whom the paintings were supposedly sold, the

*sine qua non* of a bill of sale. Whether this document apparently obtained from the archives of

Walter Feilchenfeldt—the dealer with the most to lose if the transaction were found to be

illegitimate and who coincidentally or otherwise appears in the provenance of a considerable

number of Nazi-looted objects—is authentic or not is anyone's guess. The statement from Walter

Feilchenfeldt, Jr. in 2018 (Exhibit K) merely restates what Exhibit J says and offers no

substantiation or corroboration. Combined with Switzerland's well-earned reputation[4] both

during and after the war as a head-in-the-sand paradise in which to launder Nazi-looted art to so-

called "good faith purchasers," the circumstances of this transaction—which the current

possessor bears the burden to prove was legitimate—are murky at best. *See, e.g.*, *Reif v. Nagy*,

106 N.Y.S.3d 5, 23 (1st App. Div. 2019) (questioning pretextual provenance story about

collection belonging to murdered Austrian Jew Fritz Grünbaum as unsupported, and holding that

---

[4] Switzerland's dubious conduct during World War II is not confined to the question of art, of course. As was established at Congressional hearings in the 1990s and in class-action litigation in this District in which Swiss banks ultimately agreed to pay more than $1.25 billion, Switzerland functioned as "Nazi Germany's Banker" at precisely the time when Max and then Hans Erich Emden were desperately trying to extract their property from Germany. *See* "U.S. and Allied Efforts To Recover and Restore Gold and Other Assets Stolen or Hidden by Germany During World War II Preliminary Study," by Stuart E. Eizenstat, Under Secretary of Commerce for International Trade, Special Envoy of the Department of State on Property Restitution in Central and Eastern Europe (available at https://fcit.usf.edu/holocaust/resource/gold/gold.pdf); *see also* "Swiss Banks Reach Holocaust Accord," *New York Times*, August 13, 1998, attached to the O'Donnell Aff. as Exhibit 2.

lack of contemporaneous receipt rendered "plainly false" the explanation by a Swiss dealer defending 1956 transaction, and made the claimed sale at best "inconclusive"). The facts in this case are hardly undisputed in any event.

Hans Erich Emden is survived by his three sons: Defendants Juan Carlos, Miguel, and Nicolas. Complaint at ¶¶ 26–29. The Emdens all live in Chile. *Id.* at ¶¶ 27–29. The Emdens have never pursued restitution of the Painting. Nonetheless, Plaintiffs allege that "the appearance of the Emden name itself in the provenance of the Painting creates a cloud on the Decedent's title to the Painting because the Emden Heirs have pursued restitution claims against *other* works of art." Complaint, ¶ 33 (emphasis added). This "cloud" of course is created by the persecution of Max, not any actions by his grandsons.

<u>The Plaintiffs Initiated Settlement Discussions with the Emdens</u>

Because of "the Emden name," as Plaintiffs themselves put it, Plaintiffs (not the Emdens) initiated a negotiation for the purpose of obtaining a release from the Emdens. When that effort was unsuccessful, Plaintiffs brought suit in this Court. Their Complaint seeks "A declaration that the Decedent's estate . . . possesses clear and marketable title to the Painting, free of any claim by Juan Carlos Emden, Miguel Eric Emden, Nicolas Marcelo Emden, or any other unknown heir of Hans Erich Emden[.]" Complaint at p. 14, Prayer for Relief. Unusually, the premise of this suit is nothing the Emdens did, but instead their *inaction*. Plaintiffs allege that the Emdens have "declined to provide a formal written statement" that "they have no claim to the Painting[.]" Complaint, ¶ 49.

Plaintiffs' legal counsel contacted Juan Carlos without warning on October 1, 2018 and asked "whether, if the Monet were to be offered for sale, you would be inclined to make . . . a claim. If you would, we would like to understand the basis for any such claim and to review any

related documents and information." Complaint, Exhibit Y.[5] This letter was intended to—and did—begin a series of settlement negotiations. Plaintiffs' counsel wrote five days later: "If this matter is to be settled . . . my client would prefer to do so promptly. . . . My client has authorized me to begin discussions and to explore the possibility of reaching a practical resolution . . . ." Complaint, Exhibit CC, Oct. 6, 2018.

Plaintiffs now try to recast this settlement discussion to bootstrap their way into jurisdiction over the Emdens. Juan Carlos, whose English is imperfect, tried to work directly with the Plaintiffs and with Christie's (the auction house apparently engaged to sell Adele Klapper's art collection) to negotiate a settlement. In his communications, Juan Carlos took a strong negotiating position while also conveying his desire to settle the matter. On October 2, 2018, Juan Carlos wrote to a representative at Christie's addressing the Painting, saying: "I would try your proposal to talk about the painting with the owners." Complaint, Exhibit AA. The next day, he contacted the Plaintiffs' counsel, writing: "So we have ground here for talks whenever you want to , but definetely [sic] there is a case here I will pursue with strength." Complaint, Exhibit Z. On October 4, Juan Carlos again wrote to Christie's, saying:

> can we proceed together to an approach from your side to come to an "arrangement" with me on the re sale of the "Palais des Doges" of Monet [. . . .] need your comments and help offrede [sic] by you…If they want to auction it they need to come with an agreement with me before, as you managed in Amsterdam with that Teniers of Max…we can all sign this quietly here in Europe where I am until mid November.

Complaint, Exhibit BB.

Counsel continued the conversation, which both sides intended—and described contemporaneously—as settlement negotiations. On October 5, 2018, Juan Carlos's (German)

---

[5] The letter which was sent by mail and email, was incorrectly addressed to Daytona Beach, Florida. As Juan Carlos explained, he lives in Chile. Complaint, Exhibit Z.

attorney wrote: "From your letters, I gather that your client wishes to settle this matter amicably, in light of the fact that there are serious gaps in the provenance of the painting." Complaint, Exhibit CC, October 5, 2018. Plaintiffs' counsel responded: "My client is not pressed to sell the Monet. If this matter is to be settled, however, my client would prefer to do so promptly. . . . My client has authorized me to begin discussions and to explore the possibility of reach a practical resolution . . . ." Complaint, Exhibit CC, October 6, 2018.[6]

Attorneys for the Plaintiffs and Juan Carlos met on November 14, 2018 to discuss settlement. *See* Complaint, Exhibit EE (Letter from Plaintiffs' counsel, stating: "As we said at the meeting, while the Estate may be willing to reach an accommodation with Mr. Emden, any such accommodation would need to be commensurate with the strength of the claim that Mr. Emden would seek to raise."). On February 20, 2019, Plaintiffs' counsel wrote regarding another meeting "to discuss the possibility of compromising this matter." Complaint, Exhibit HH.

Negotiations continued throughout 2019. The settlement negotiations ultimately failed to produce an agreement, however, and Plaintiffs filed the Complaint on November 1, 2019.[7]

---

[6] While Plaintiffs should have used none of the settlement discussions to make a substantive point, Plaintiffs may not use them as a shield as well as a sword. Not only do the internal inconsistencies in Plaintiffs' own allegations make their claim of entitlement to judgment before Defendants can defend themselves inappropriate, but Plaintiffs also admit (when it suits them) that there is no exigency whatsoever to the sale of the Painting ("My client is not pressed to sell the Monet"). This dispenses with Plaintiffs' manufactured claims of urgency and dooms any remaining suggestion that the Court should ignore the Rules of Civil Procedure and hand Plaintiffs their ultimate goal before the case even begins.

[7] Plaintiffs served but never filed a Motion to Show Cause, which cannot be pursued unless and until the Court finds jurisdiction.

<u>**ARGUMENT**</u>

**I.    PLAINTIFFS CANNOT ESTABLISH JURISDICTION OVER THE EMDENS**

Plaintiffs' attempt to turn settlement discussions against the Emdens is contrary to New York law and the Due Process Clause. This suit must therefore be dismissed for lack of personal jurisdiction. "On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape Antitrust Litig.)*, 334 F.3d 204, 206 (2d Cir. 2003). When facing a motion to dismiss for lack of personal jurisdiction, the plaintiff must "make a *prima facie* showing of jurisdiction." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "In determining whether a plaintiff has met this burden, [the court] will not draw 'argumentative inferences' in the plaintiff's favor." *Id.* "A *prima facie* showing of jurisdiction 'does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010) (quoting *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564–65 (S.D.N.Y. 1997)).

> **A.    The Emdens' *De Minimus* Forum Contacts Do Not Establish Personal Jurisdiction Under New York Law.**

This case is controlled by the New York long-arm statute. *See Rosenblatt v. Coutts & Co. AG*, 750 Fed. App'x. 7, 9 (2d Cir. 2018) ("In a diversity action, whether a court has personal jurisdiction over a defendant 'is determined by the law of the forum in which the court sits.'") (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)) (applying New York law). In particular, Plaintiffs rely on New York law providing that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . .

transacts any business within the state[.]" CPLR § 302(a). "The New York Court of Appeals has instructed that the 'overriding criterion' in determining whether a [person] 'transacts any business' in New York within the meaning of the statute is whether [he or she] 'purposefully avails itself of the privilege of conducting activities within New York.'" *Rosenblatt*, 750 Fed. App'x. at 9–10 (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014)).

None of the Emdens purposefully availed themselves of the privileges of conducting activities within New York. They merely tried, and failed, to resolve a dispute instigated by the Plaintiffs. There is no basis for jurisdiction over the Emdens.

### 1. Settlement Negotiations Do Not Create Personal Jurisdiction.

New York does not permit a plaintiff to weaponize unsuccessful settlement negotiations. "It is well-established that a defendant can . . . make efforts to negotiate a settlement without consenting to jurisdiction." *Flame Mar. Ltd. v. Hassan Ali Rice Exp. Co.*, 2010 U.S. Dist. LEXIS 47041, at *8 (S.D.N.Y. May 4, 2010). Otherwise, "a defendant who contested jurisdiction would be incentivized, even in close cases, to be hostile to and avoid negotiations with an adversary—a specter that would frustrate settlements and run contrary to public policy." *Id.* at *9 (dismissing complaint).

The rule against using settlement negotiations to entrap defendants is long-established. *See Glens Falls Cement Co. v. Severn Coal Co.*, 1990 U.S. Dist. LEXIS 1609, at *18 (N.D.N.Y. Feb. 14, 1990) ("With respect to the settlement negotiations, the court holds that these alone will not suffice to convey personal jurisdiction over Leckie Fuel."); *Columbia Pictures Indus., Inc. v. Schneider*, 435 F. Supp. 742, 7499 n.4 (S.D.N.Y. 1977) ("A meeting to discuss settlement of a lawsuit undertaken while a defendant is in New York on personal business is not, in our view, a 'transaction of business' out of which the cause of action may be said to have arisen."); *see also Sayles Biltmore Bleacheries, Inc. v. Soft-Fab Textile Processors, Inc.*, 440 F. Supp. 1010, 1013

(S.D.N.Y. 1977) ("The New York visit [by the defendant] is not an adequate predicate for jurisdiction. First, insofar as it was the occasion for a meeting about the contract that was never consummated . . . it cannot have given rise to this cause of action.").

This New York rule follows long-established policy in favor of encouraging parties to resolve their disputes. "[I]f every offer to compromise and promote peace is used as a contact to establish personal jurisdiction in this State over the party who presents it, 'many settlements would be prevented, and unnecessary litigation would be produced and prolonged.'" *Smith Architectural Metals, L.L.C. v. Am. Railing Sys.*, 207 N.C. App. 151, 155 (2010) (quoting *Hammond Packing Co. v. Dickey*, 183 F. 977, 978 (8th Cir. 1911)).

Even if settlement discussions could theoretically be used to establish purposeful availment, the settlement discussions in this case would not. The Emdens and their counsel never invoked New York law, and did not otherwise avail themselves of the protections or benefits of New York law. Juan Carlos did not even contemplate executing an agreement in New York. He wrote to a Christie's representative: "we can all sign this quietly in Europe where I am until mid November[.]" Complaint, Exhibit BB (October 4, 2018 email). None of the communications by either side reveal or even suggest that the Painting is in New York or would be sold here.

Plaintiffs' attempt to fit this case into the long arm statute is undermined by the fact that even a *completed* settlement agreement may not create jurisdiction. In *Fagan v. Republic of Austria*, the Southern District found that a settlement that was "formally negotiated and signed in Austria" did not create jurisdiction in New York. 2011 U.S. Dist. 32058, at *51 (S.D.N.Y. Mar. 25, 2011). The court explained: "Although some of the communications related to these transactions . . . may have been received by the plaintiffs in the United States, this nexus is a far cry from the purposeful availment required by New York law." *Id.* at *51–52. Likewise, the

communications that the Plaintiffs and their counsel received in the United States do not

establish that the Emdens purposefully availed themselves of New York law.

> **2.     Discussing, and Even Asserting, Existing Rights Does Not Establish Personal Jurisdiction.**

Even when discussions of existing rights are not technically settlement negotiations, such

statements are still insufficient to create jurisdiction. Thus, no matter how Plaintiffs try to

characterize the discussions that they initiated, the law does not allow those statements' use as a

foundation to hale the Emdens here from Chile, even if the statements' effects are felt in the

forum state. Any statements that Juan Carlos made[8] were in an effort to resolve the dispute or, at

most, to discuss or preserve any already-existing legal rights.

Plaintiffs allege that Juan Carlos interfered with efforts to sell the Painting when he wrote

to the Plaintiffs and to a Christie's representative, stating: "So we have ground here for talks

whenever you want to, but definetely [sic] there is a case here I will pursue with strength. . . . We

keep in touch." Complaint, Exhibit Z. This statement, at most, is an assertion of rights. Juan

Carlos often wrote from Europe,[9] and at no time did he threaten litigation in New York. In most

of Juan Carlos's communications, including those to Sotheby's and Christie's, he did not

reference legal action at all. *See, e.g.*, Complaint, Exhibit BB (writing to Christie's: "can we

proceed together to an approach from your side to come to an 'agreement' with me on the re sale

of the 'Palais des Doges' of Monet that was 'sold' in 1940??"); Exhibit JJ (writing to Christie's:

"we will need your help soon on the Palais des Doges issue with Klappers and Tom Kline.");

---

[8] Statements by Juan Carlos relate only to the question of jurisdiction over Juan Carlos. Those statement cannot be imputed to his brothers, about whom the Complaint is nearly silent other than naming them.

[9] *See* Complaint, Exhibit Z (writing, on October 3, 2018: "I am in Hamburg . . . until November 18.").

Exhibit DD (writing to Sotheby's: "your comments would be interesting Lucian for me as I feel attorney Stoetzel [Juan Carlos's counsel] needs help!").

In *Marvel Characters, Inc. v. Kirby*, the Second Circuit held that mere assertions of legal rights do not create personal jurisdiction. 726 F.3d 119 (2d Cir. 2013). In that case, the children of Jack Kirby, the famed creator of Captain America, The Incredible Hulk, and other comic book characters and stories, sent notices to various Marvel entities. Those notices purported to extend the Kirby children's legal rights regarding their father's drawings pursuant to the federal Copyright Act of 1976. *Id.* at 127. The Marvel entities took the position that the drawings at issue were "works made for hire," that the Kirby children lacked the rights they sought to extend, and that the notices had no legal effect. *Id.* Much like the present Plaintiffs, the Marvel entities sued the Kirby heirs for a declaration regarding ownership of the art. The Marvel entities argued that the Kirby children's conduct "'target[ed] the center of gravity of Marvel's publishing business'" and was "'designed to disrupt and divert license fees from Marvel's New York-based business[.]'" *Id.* at 131 (quoting Marvel's characterizations).

The Second Circuit held that sending those notices to New York did not expose the non-resident Kirby heirs to jurisdiction.[10] Like present Plaintiffs, the Marvel entities relied on CPLR § 302(a)(1) in their attempt to find a toehold for jurisdiction. *Id.* at 128. But like the Emdens, the Kirby children had never sought to avail themselves of New York law. *Id.* at 129. Like the Emdens, the Kirby children were not attempting to solicit business. *Id.* Although the Second Circuit acknowledged that "These statements [alleging harm in New York] may well be essentially true, if perhaps a bit hyperbolic," it nonetheless held that these effects—even if

---

[10] The Kirby siblings who contested jurisdiction were residents of California. The other Kirby siblings, residents of New York, did not.

intentional—did not create jurisdiction. *Id.* Likewise, even if Juan Carlos had intended for his communications to affect people or events in New York, that would not create jurisdiction.

The jurisdictional connection in this case is even more attenuated than the one in *Marvel*. At all relevant times, Juan Carlos did not know where the Painting was located, or where any future sale of the Painting would take place. The only times when he discussed the Painting with a non-party, he communicated with representatives of Christie's and of Sotheby's. Christie's is a U.K. company. It has salesrooms in Amsterdam, Dubai, Geneva, Hong Kong, London, Milan, New York, Paris, Shanghai, and Zurich.[11] Sotheby's is a Delaware corporation. It holds auctions in Doha, Dubai, Hong Kong, Geneva, London, Milan, New York, Paris, and Zurich.[12] The Painting could have been held in any number of repositories, for future sale at any number of auction rooms. In fact, Sotheby's sold another painting by Monet, of the same view, in London, on February 26, 2019.[13] The sale price of £27,534,000 was in the high end of the pre-auction estimate (£20–30 million), and it would be just as plausible to expect the sale to be in London (or Hong Kong, or Zurich, or any of the other showrooms) as it would be in New York. At most, Juan Carlos affected a hypothetical, future sale in an indeterminate location. He did not purposefully avail himself of the privileges of New York law.

*Marvel* was consistent with longstanding precedent that merely asserting legal rights in New York, without relying on New York's laws, does not create jurisdiction. In *Ehrenfeld v. Bin Mahfouz*, a writer sought a declaratory judgment against an individual whom she discussed in

---

[11] *See* https://www.christies.com/locations?sc_lang=en&lid=1.

[12] *See* https://www.sothebys.com/en/about/locations.

[13] *See* https://www.sothebys.com/en/auctions/ecatalogue/2019/impressionist-modern-art-evening-sale-l19002/lot.6.html#saleroomNoticeModal.

her book, *Funding Evil: How Terrorism Is Financed—and How to Stop it*. 9 N.Y.3d 501, 504 (N.Y. Ct. App. 2007) (discussed by *Marvel*, 726 F.3d at 129). The defendant (Bin Mahfouz), a U.K. resident, had sued the writer for libel in the U.K. and had served her with related litigation papers in New York on six occasions. *Id.* at 505. The New York Court of Appeals held that service in New York did not establish jurisdiction. *Id.* at 508. As with Juan Carlos's communications, "none of defendant's relevant New York contacts have invoked the privileges or protections of our State's laws." *Id.* at 509.

Decades earlier, in *Beacon Enter., Inc. v. Menzies*, the Second Circuit considered a cease and desist letter that the defendant had sent to New York. The Second Circuit noted: "It is difficult to characterize Menzies' letter alleging infringement in an unspecified locale and threatening litigation in an unspecified forum as an activity invoking the 'benefits and protections' of New York law." 715 F.2d 757, 766 (2d Cir. 1983).

Likewise, Juan Carlos did not know (and therefore could not allege) where the Painting was, or where the Plaintiffs would try to sell it. Nor did he invoke any particular laws or indicate where he would consider bringing any possible claim. In *Menzies*, as here, there was no jurisdiction. *Id.*

**B.    Due Process Forbids Personal Jurisdiction Over these Chilean Defendants.**

Even if the New York long arm statute applied here—and it does not—the Due Process Clause would prohibit Plaintiffs' attempt to force three Chilean citizens to defend a suit in New York. "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). The minimum contacts requirement is not met here, where the Emdens merely attempted to settle a dispute. Nor would subjecting the Emdens to a suit in New York be reasonable. The reasonableness inquiry, "in essence, asks whether personal

16

jurisdiction 'is reasonable under the circumstances of the particular case[.]'" *D&R Glob.*

*Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 300 (2017). In considering

reasonableness:

> A court must consider the burden on the defendant, the interests of the forum State, and
> the plaintiff's interest in obtaining relief. It must also weigh in its determination "the
> interstate judicial system's interest in obtaining the most efficient resolution of
> controversies; and the shared interest of the several States in furthering fundamental
> substantive social policies."

*Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987) (quoting *World-Wide*

*Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980)).

As in *Asahi*, "the burden on the defendant[s] in this case is severe." *Id.* at 114. To

paraphrase *Asahi*, Plaintiffs asks the Emdens:

> not only to traverse the distance between [Chile] and [New York], but also to submit [this
> matter] to a foreign nation's judicial system. The unique burdens placed upon one who
> must defend oneself in a foreign legal system should have significant weight in assessing
> the reasonableness of stretching the long arm of personal jurisdiction over national
> borders.

*Id.* (concluding that the exercise of personal jurisdiction by a California court over a Japanese

defendant "would be unreasonable and unfair") (second sentence quoted by *AlbaniaBEG*

*Ambient Sh.p.k. v. Enel S.p.A.*, 160 A.D.3d 93, 110 (2018)).

"Constitutional due process assures that an individual will be subjected to the jurisdiction

of a court where the maintenance of a lawsuit does not offend 'traditional notions of fair play and

substantial justice.'" *Waldman v. PLO*, 835 F.3d 317, 328 (2d Cir. 2016) (quoting *Int'l Shoe Co.

v. Wash.*, 326 U.S. 310, 316 (1945)). It would be deeply offensive to fair play if Plaintiffs were

allowed to use settlement discussions to trap the Emdens in a foreign court.

The Due Process Clause does not countenance this tactic. *See In re A & W Publrs.*, 1984

U.S. Dist. LEXIS 16258, at *4–5 (S.D.N.Y. May 31, 1984) (discussing due process concerns and

explain: "Normally, settlement efforts may not be relied on to create a basis for jurisdiction[.]")
(jurisdiction found based on unique facts); *Digi-Tel Holdings v. Proteq Telcoms.*, 89 F.3d 519,
524–25 (8th Cir. 1996) ("[A]s to the discussion of a possible settlement, courts have hesitated to
use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes. . . . Giving
jurisdictional significance to such activities may work against public policy by hindering
settlement of claims."); *In re Shipowners Litig.*, 361 N.W.2d 112, 115 (Minn. Ct. App. 1985)
("[A] single meeting where the focus is negotiation of a settlement, rather than the promotion of
business, cannot comprise sufficient contact for the exercise of personal jurisdiction, especially
where respondents came to Minnesota at the request of appellants to discuss a possible
settlement of their contract differences. . . . To hold under such circumstances that personal
jurisdiction attaches would amount to a form of civil entrapment not contemplated in law.").

   The Due Process clause does not require a defendant to waive personal jurisdiction by
virtue of asserting a legal right, either. *See Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 197
(1st Cir. 1980) ("[T]he mailing of an infringement notice standing alone has rarely been deemed
sufficient to satisfy the constitutional standard."); *Marlin Firearms, Co. v. Wild W. Guns, L.L.C.*,
2013 U.S. Dist. LEXIS 77175, at *19 (D. Conn. May 31, 2013) ("exercising jurisdiction on the
basis of the cease and desist letter would be contrary to circuit precedent regarding due process
requirements."); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360–61
(Fed. Cir. 1998) ("Principles of fair play and substantial justice afford a patentee sufficient
latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign
forum. A patentee should not subject itself to personal jurisdiction in a forum solely by
informing a party who happens to be located there of suspected infringement. Grounding
personal jurisdiction on such contacts alone would not comport with principles of fairness.").

**II.    THE COURT SHOULD DECLINE PLAINTIFFS' REQUEST TO PREJUDGE THIS CASE**

In the parties' joint letter to the Court on November 8, 2019, Plaintiffs suggested that if the Court denied the current motion, then a show cause should be heard as soon as possible for the purpose of rendering final judgment. Even to state the request reveals that it is misguided. Not only would it offend any sense of procedural due process in a case where the Defendants have not filed—and may never file—a responsive pleading, it also glosses over the infirmities in Plaintiffs' *prima facie* case in the Complaint. Defendants decline to litigate a case where they contest the jurisdiction of the Court, but to make the point, they simply observe the following flaws that dictate that, even on the existing record of Plaintiffs' hand-picked documents, Plaintiffs would not prevail. Plaintiffs' inadequate Complaint certainly presents no excuse to ride roughshod over Defendants' right to defend themselves.

First, on the facts as alleged, the Klapper estate has not established that it has good title to the Painting even independent of any concerns about the Nazis' persecution of the Emdens. There are too many unknowns. As noted above, there is no bill of sale. Instead, there is a self-serving series of documents in the file of the art dealer who sought to uphold the validity of the sale. None are admissible. To the contrary, rather than contemporary records of business activity, they are out of court and after-the-fact justifications, *i.e.*, hearsay. Worse yet are the various texts affixed to the Complaint. The characters involved in this Painting are like the "Who's Who" of laundering stolen art in the 1950s (even without drilling down on Feilchenfeldt, a complicated figure in his own right). Exhibit M is a statement by the Emil Bührle Collection about another Monet that Max Emden owned, *Poppy Field Near Vétheuil*. The Bührle Collection contests the notion that it lacks title to that painting, but it is hardly a credible source of information. Emil Bührle was an arms dealer and known trafficker in stolen Jewish art; the fact that an Emden

19

painting ended up in Bührle's hands only supports the notion that Emden's collection was not dispersed voluntarily. It hardly establishes any sort of uncontested fact of the sort Plaintiffs would wish. *See* O'Donnell Aff., <u>Exhibit 3</u> (*New York Times* March 3, 2016 article "Plan for Nazi-Era Arms Dealer's Collection Sets Off Backlash at Zurich Museum") ("Mr. Bührle was a Nazi arms dealer who bought art that had been looted from Jewish owners."); <u>Exhibit 4</u> (*Daily Beast* April 14, 2017 article "A Swiss Merchant of Death's Nazi Friends and Suspicious Masterpieces") ("He dealt with known traffickers in looted Jewish art, and, according to documents in the U.S. National Archive, he seems to have enjoyed preferential treatment from Hermann Göring when buying art from Nazi agents."); <u>Exhibit 5</u> (*Daily Mail* February 12, 2008 article "Nazi link to 'spectacular' £84million theft of Van Gogh, Cézanne, Degas and Monet masterpieces") ("The stolen works were among some 200 collected by billionaire pro-Nazi industrialist Emil Buehrle who died in 1956. He made his fortune producing weapons for Hitler's forces during the Second Worldwar, including anti-aircraft guns which brought down many British bombers. At least 13 of his works of art were looted from Jewish families by the Nazis and had to be returned in the late 1940s."); <u>Exhibit</u> 6 (*Tablet* May 17, 2019 article "A Blood Stained Renoir on Exhibit in Paris") ("Bührle was no naïf in the view of investigators for the Allies, who considered him the leading buyer of looted art in Switzerland. He purchased paintings in Paris through intermediaries for Adolf Hitler's second-in-command, Hermann Goering, and in turn he provided Goering with coveted Swiss currency. . . .").

The Complaint's citation to a book about the famed writer Erich Maria Remarque is also hearsay and also irrelevant. That book takes a swipe at Juan Carlos's general restitution efforts without any basis and attempts to vouch for the efforts of Feilchenfeldt (Document 1–20 at page 10 of 10). In so doing, however, the book betrays its bias. First, it cites to Christoph Bernoulli

(*id.*) as another agent supposedly working on the Emdens' behalf. Bernoulli is *yet another* "red flag" whose association with any painting compels suspicion *and* who was listed on a 1946 "index of enemy and collaborationist personnel involved in art looting recommended for exclusion from the United States." *See* Amended Complaint at ¶ 51, *Meyer v. Bd. of Regents of the Univ. of Okla.*, 2014 U.S. Dist. LEXIS 68510 (S.D.N.Y. May 14, 2014) (Case No. 1:13-cv-3128-CM) (French Jew whose painting was stolen from Vichy safe deposit later surfaced in the hands of Bernoulli who sold it in the 1950s in Switzerland).

Second, the Remarque book also refers to a *third* "prominent local collector," Baron Hans-Heinrich Thyssen-Bornemisza. (Document 1–20 at page 6 of 10). This is yet another blaring alarm. A U.S. District Court in Los Angeles had occasion earlier this year to address Thyssen-Bornemisza, who acquired *Rue St. Honoré, après midi, effet de pluie*, by Camille Pissarro. The problem was that the painting had been looted in 1939 from Lilly Cassirer, a German Jew forced to sell to Jakob Scheidwimmer, a Nazi art appraiser. Of the Thyssen-Bornesmisza family, the District Court wrote that it "had a history of purchasing art and other property that had been confiscated by the Nazis." *Cassirer v. Thyssen-Bornemisza Collection Foundation*, No CV 05-3459 (C.D. Cal.), Docket No. 621 (Apr. 30, 2019), Findings of Fact and Conclusions of Law at p. 5, 34 ("[The museum's] refusal to return the Painting to the Cassirers is inconsistent with the Washington Principles [on Nazi-Confiscated Art] and the Terezin Declaration.").

If the Court senses a pattern, it is warranted. The network of Swiss dealers and agents during and after the war is a fetid swamp of opportunism and staged "good faith" purchases by men who knew quite otherwise. *See Reif*, 106 N.Y.S.3d at 23. The intersection with this sordid history only on the face of the documents attached to the Complaint is just the tip of the iceberg

with this subject. Plaintiffs' suggestion than the Painting's provenance is somehow beyond reproach is simply not the case.

Distilled to its essence then, the Plaintiffs' case as submitted to date consists of either speculation or settlement negotiations, neither of which can be used to meet the Plaintiffs' burden of proof. "[C]onduct or a statement made during compromise negotiations about the claim" are inadmissible "either to prove or disprove the validity or amount of a disputed claim or impeach by a prior inconsistent statement or a contradiction[.]" Fed. R. Evid. 408(a). This rule promotes "'the public policy favoring the compromise and settlement of disputes' that would otherwise be discouraged with the admission of such evidence." *Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996) (quoting Advisory Committee's Notes). It "is premised on the idea that encouraging settlement of civil claims justifies excluding otherwise probative evidence from civil lawsuits." *United States v. Gonzalez*, 748 F.2d 74, 78 (2d Cir. 1984).

The policy is so strong that even when settlement communications could technically fall within an exception, "Care should be taken that an indiscriminate and mechanistic application of this 'exception' to rule 408 does not result in undermining the rule's public policy objective. . . . The [court] should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Trebor Sportswear Co. v. Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, 408, at 408–31 (1988)). Although the parties to this case could not ultimately resolve their dispute, the fruit of this strong and longstanding policy is seen in the months-long negotiations that the Plaintiffs began, and which the Emdens participated in.

Lastly, the Complaint raises the prospect of laches *against* the Defendants, the opposite of its usual application. *See, e.g., United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 265

n.24 (S.D.N.Y. 2009) ("To the extent the Museum contends that the equitable defense of laches operated to invest Dr. Leopold with title to *Wally*, the proposition is defective as a matter of law. Laches is a defense, not a means by which title is positively established.") (quoting *Halcon Int'l, Inc. v. Monsanto Austl. Ltd.*, 446 F.2d 156, 159 (7th Cir. 1971) ("The doctrine of laches . . . is a shield of equitable defense rather than a sword for the investiture or divestiture of legal title or right.")).[14]

In service of this argument, Paragraph 15 alleges that Juan Carlos "stated publicly in 2007 that he knew the Painting was in the Klapper collection," citing Exhibits H, V, W, and X to the Complaint for that proposition. Complaint, ¶ 15. These citations are puzzling. Exhibit H is a series of letters from 1952, decades before the Klappers obtained the Painting. Moreover, this correspondence does not even concern the Painting, it is about the transfer and settlement of claims for real property in Hamburg that was in the hands of a Ms. Frieda Schloika. It has, literally, nothing to do with anything Juan Carlos has said about the Painting.

Exhibit V is video of a 2007 television show in which Juan Carlos does *not* represent any affirmative knowledge of the Klapper possession, let alone "stat[ing] publicly in 2007 that he knew the Painting was in the Klapper collection." There is a voiceover *by the journalist* identifying "the Klapper Foundation" as the owner of the Painting, but there is no indication Juan Carlos was told that during the interview. The documentary proves quite the opposite of what

---

[14] *See also Saade v. Wilmington Sav. Fund Soc'y*, 2017 U.S. Dist. LEXIS 154846, at *10 (D. Mass. Sept. 22, 2017) (dismissing claim alleging unlawful foreclosure proceedings that involved allegation of laches: "In other words, laches is a shield, not a sword. While Plaintiff may be able to use laches as an affirmative defense to a lawsuit brought against him, he cannot use laches as the basis for a claim against a defendant."); *LaPrade v. Rosinsky*, 882 A.2d 192, 198 (D.C. 2005) ("Appellant is not in a position to assert laches in support of her complaint. Laches may be used as a shield, but not as a sword by one seeking affirmative relief. . . . A plaintiff may not use laches to bar a right asserted merely by way of defense.").

Plaintiffs would hope: it identifies the "complete mystery" under which Max's painting collection disappeared, and also notes the absence of bills of sale for other paintings. Once again, more questions than answers. Further, it establishes that Juan Carlos *did not know* until at least 2007 where the Painting was, rendering the recitation of the Painting's other private history (it having been owned anonymously for decades) moot. The video does also refer to threats against Max's life, in Switzerland, in 1939 by the German regime, and to Hans Erich's own persecution by the Nazis. This is easy enough to understand; Fascist and Nazi Germany ally Italy were literally within Max's line of sight from the Brissago Islands; the international border cuts through Lake Maggiore just to the south.

Lastly, the citations to Exhibit W are likewise not indicative of Juan Carlos's knowledge or assertions; they are *catalogues raisonnés* (a comprehensive treatment of every work by a particular artist) by the Wildenstein Institute of the works of Claude Monet. In sum, the Plaintiffs' laches argument falls short.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Emdens respectfully request that the Court **<u>DISMISS</u>** the Complaint.

Respectfully submitted,

Dated:  December 13, 2019

/s/ Nicholas M. O'Donnell
Nicholas M. O'Donnell
nodonnell@sullivanlaw.com
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)

*Attorneys for Juan Carlos Emden, Miguel Eric Emden, and Nicolas Marcelo Emden*

24

Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 13, 2019.

/s/ Nicholas M. O'Donnell