USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/16/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN F. BLOOM; FIDUCIARY TRUST COMPANY INTERNATIONAL *as* EXECUTORS OF THE LAST WILL & TESTAMENT OF ADELE KLAPPER,

        Plaintiffs,

v.

JUAN CARLOS EMDEN, MIGUEL ERIC EMDEN, and NICOLÁS MARCELO EMDEN,

        Defendants.

No. 19-CV-10155 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

    On November 1, 2019, Plaintiffs Susan F. Bloom and Fiduciary Trust Company International, executors of decedent Adele Klapper's estate, filed this action seeking a declaratory judgment that *Le Palais Ducal*, a painting by Claude Monet valued at approximately $30 million (the "Painting"), belonged to Mrs. Klapper at the time of her death. Defendants Juan Carlos Emden, Miguel Eric Emden, and Nicolás Marcelo Emden, all of whom are Chilean citizens and residents, are the descendants of a German businessman who owned the Painting in the early portion of the Twentieth Century. Defendants assert that their father sold the Painting under duress in 1942 as a result of Nazi persecution, and that they are thus owed a portion of the profits of its eventual sale. Plaintiffs dispute that the 1942 sale was forced and they seek to clear title to the Painting in order to sell it.

    In late 2019, Defendants moved to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(2), arguing that the Court lacks personal jurisdiction over them because

they are Chilean citizens with no ties to New York. After oral argument on the initial motion, the Court ordered the parties to engage in jurisdictional discovery. Now before the Court is Defendants' renewed motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons that follow, Defendants' motion is denied. Given the Painting's physical presence within this district, the Court finds that it has *in rem* jurisdiction to determine the Painting's ownership. Accordingly, the Court declines to address Defendants' arguments contesting personal jurisdiction.

## BACKGROUND[1]

The Court includes only the facts relevant for deciding Defendants' motion to dismiss.

### I.     Overview of the Painting's Ownership

From around 1917 until his death in 1940, Defendants' grandfather, Dr. Max James Emden ("Dr. Emden"), a German businessman who lived in Switzerland after 1929, owned the Painting. Dr. Emden was born into a Jewish family and converted to Protestantism as a young man. Compl. Ex. FF. After Dr. Emden passed away, his son and only heir, Hans Erich Emden ("Hans Erich"), inherited the Painting, as well as other pieces from Dr. Emden's art collection. Shortly thereafter, Hans Erich moved to Chile.

In 1942, Hans Erich sold the Painting, which had remained in Switzerland, through an agent, Olga Ammann, "a longstanding and trusted employee of [Dr. Emden] and Hans Erich," to

---

[1] The Court draws the following facts from the complaint and supporting exhibits, as well as the briefing and documents produced through jurisdictional discovery and submitted in connection with the instant motion. *See Vista Food Exch., Inc. v. Champion Foodserv., LLC*, 124 F. Supp. 3d 301, 307 (S.D.N.Y. 2015) ("Because a motion to dismiss for lack of personal jurisdiction 'is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion.'"); *ESI Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 50 n.54 (S.D.N.Y. 1999) ("In considering a Rule 12(b)(2) motion, the court may consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56.").

Walter Feilchenfeldt, a Jewish art dealer and "a trusted advisor to [Dr. Emden]." Compl. ¶ 10. According to Plaintiffs, "on information and belief," Feilchenfeldt "was acting as an agent for his client, the art collector, Hermann Lutjens[.]" *Id*. Defendants assert that "the circumstances of this transaction . . . are murky at best," Defs.' Br. at 6, and that this was instead a forced sale, meaning one undertaken involuntarily as a result of Nazi persecution. Plaintiffs dispute that characterization, noting that "Hans Erich had met with Feilchenfeldt twice to discuss the sale of his father's art collection," "knew the Painting was being purchased on behalf of Lutjens," and was ultimately sold at "a higher price than one Ammann had rejected on his behalf months earlier." Compl. ¶¶ 13–14.

The Painting remained in Lutjens' possession until 1959, when it was sold to Erich Maria Remarque. *Id.* ¶ 14. After Remarque passed away in 1970, the Painting passed to Remarque's wife and then, via "a highly publicized auction . . . at Sotheby's" in 1979, to Paul Kantor. *Id*. In 1980, Herb Klapper, Mrs. Klapper's husband, "acquired the Painting through a private sale." *Id*. The Painting remained in his possession until his death in 1999, at which point it came into Mrs. Klapper's possession. Mrs. Klapper passed away on February 14, 2018. *Id.* ¶¶ 1–5.

## II. Parties' Correspondence About the Painting

Plaintiffs' jurisdictional discovery consisted of 464 individual emails, as well as information about at least sixteen telephone calls and five in-person meetings between Defendants and/or their agents and employees of Christie's and Sotheby's auction houses. Winter Decl. ¶ 2. Of these, forty-six emails concern the Painting at issue in this litigation. *Id.* ¶ 3. The rest primarily involve Juan Carlos Emden's and the Emden family's agents' negotiations with the two auction houses regarding the sale of other pieces of artwork to which Defendants indicated they might have a claim. Plaintiffs have also submitted six additional documents which they claim

3

demonstrate the degree to which Miguel Eric and Nicolás Marcelo Emden were involved in their brother Juan Carlos's efforts to intervene in the sale of the Painting. *See* Second Winter Decl.

Defendants—Juan Carlos, Miguel Eric, and Nicolás Marcelo—are Hans Erich's sons and heirs. Compl. ¶ 26. They are Chilean residents and citizens. *Id.* ¶¶ 27–29. In October 2018, with plans to auction the Painting at Christie's in November 2018, Plaintiffs "reached out to the Emden Heirs to confirm that the Emden Heirs had no intention of interfering with the sale." *Id.* ¶ 16. According to Plaintiffs, they did so because, "[i]n the art market, the appearance of the Emden name itself in the provenance of the Painting creates a cloud on the Decedent's title to the Painting because the Emden heirs have pursued restitution claims against other works of art." *Id.* ¶ 23.

The Emdens' involvement in the New York art market dates back to at least 2006, when they first interacted with the auction houses to negotiate agreements to receive portions of the sale prices of certain pieces of art that once belonged to their family. In 2006, the Emdens received €527,000 for a painting by David Teniers auctioned through Sotheby's. Undisputed Facts ("UF") ¶ 7. Several years later, in 2011, the Emdens received €170,000 for a set of portraits by Isaack Luttichuys auctioned through Christie's. UF ¶ 6. Following these negotiations, on June 15, 2012, Mel Urbach, a New York-based attorney representing Defendants, sent identical emails to Monica Dugot, the International Director of Restitution at Christie's, and Lucian Simmons, the Vice Chairman of the Restitution Department at Sotheby's, that suggested an intention to assert a restitution-related claim to any work with the Emden name in its provenance. *See* Winter Decl. Exs. 2, 6. Ms. Dugot and Mr. Simmons are both based in New York. UF ¶¶ 4–5. Mr. Urbach's letter first informed them that he "had been retained by the Emden family to lead and coordinate the recovery of all the assets belonging to their family." Winter Decl. Ex. 2. Explaining that "[Dr. Emden] and [Hans Erich] were victims of Nazi persecution," he requested that the auction houses

4

notify him when art that was previously owned by Dr. Emden came on the market "so that [they] could settle the family claim on these items." *Id*.

Between Mr. Urbach's 2012 email and when Plaintiffs sought to auction the Painting in 2018, the Emdens and their agents indisputably had extended contact with New York-based employees of Christie's and Sotheby's, and specifically with Ms. Dugot and Mr. Simmons. Over the years, they exchanged hundreds of emails and many phone calls, and had in-person meetings regarding the Emden family's potential claims to pieces of art and their intention to intervene in their sales. *See, e.g.*, UF ¶¶ 32–34, 38–39, 42–49; Winter Decl. Exs. 7–16.

Given this history of communication between the auction houses and the Emdens, and because they asked to be notified when artwork formerly owned by the Emden family reached the market, Christie's and the Emdens were in communication once again when Plaintiffs planned to auction the Painting in 2018. On September 4, 2018, Mr. Urbach, Markus Stoetzel, the Defendants' German-based attorney, and Ms. Dugot had a phone call. UF ¶¶ 3, 48. Just over a week later, on September 17, 2018, Mr. Urbach had an in-person meeting with Ms. Dugot and Marc Porter, another Christie's employee, in New York. UF ¶ 49.

Several days later, on September 22, 2018, Plaintiffs' attorney sent an email to her clients with the subject line "Christie's Sale – Time Sensitive Update," asking them to call her so she could "brief [them] each on an issue that had come up." Supp. O'Donnell Decl. Ex. 10. Given the meetings between Christie's and the Emdens' lawyers and the subsequent "time sensitive" update from Plaintiffs' counsel only five days later, the Court infers that at some point between September 17 and September 22 Christie's alerted Plaintiffs to the Emdens' claim to the Painting.

On October 1, 2018, Thomas Kline, an attorney representing Plaintiffs, sent a letter to Juan Carlos, copying Mr. Urbach and Mr. Stoetzel, that read in part:

> We understand that you have been making claims on certain artworks which, like the Monet, have the Max Emden name in the provenance and were sold in the 1940s. While we see no basis for a legal claim to be made here, out of an abundance of caution we write to invite you to tell us whether, if the Monet were to be offered for sale, you would be inclined to make such a claim. If you would, we would like to understand the basis for any such claim and to review any related documents and information.

Compl. Ex. AA at 4. Juan Carlos forwarded that letter to Ms. Dugot at Christie's along with an email that stated "this WAS A FORCED SALE by my grand father (sic)" and "I would try your proposal to talk about the painting with the owners." *Id.* at 2. That same day he also sent an email to Lucian Simmons at Sotheby's stating that "this was FOR SURE a forced sale." Winter Decl. Ex. 39; UF ¶ 11.

The next day, October 3, 2018, Mr. Urbach and Mr. Stoetzel had yet another call with Ms. Dugot on behalf of the Defendants. UF ¶ 50. That same day, Juan Carlos responded to Plaintiffs' counsel's inquiry. After providing a "basic realistic account" of what he believed happened to the Painting, Juan Carlos asserted that there are "ground[s] here for talks whenever you want to, but definitely there is a case here [he] will pursue with strength." Compl. Ex. Z. Copying Dugot on that e-mail, he informed Plaintiffs' counsel that Dugot "ha[d] assisted [Defendants] on partial recoveries in the past in Amsterdam." *Id.* Shortly thereafter, Juan Carlos e-mailed Dugot, asking whether they could "proceed together to an approach from [her] side to come to an 'agreement' with [him] on the re sale of the 'Palais des Doges' [sic] of Monet that was 'sold' in 1940." Compl. Ex. BB (asking for Dugot's "comments and help"). He then stated that "[i]f [Plaintiffs] want to auction it they need to come with an arrangement with me before . . . we can all sign this quietly here in Europe where I am until mid November." *Id.*; UF ¶ 14.

On October 5, 2018, Mr. Stoetzel contacted Plaintiffs' counsel. Compl. Ex. CC. He had "gather[ed] that [counsel's] client wishes to settle this matter amicably, in light of the fact that

6

there are serious gaps in the provenance of the painting." *Id.* Because he believed "there is some urgency here," he asked Plaintiffs' counsel to propose how to proceed. *Id.* Plaintiffs' counsel responded, first correcting the "impression that there is urgency to this matter." *Id.* Counsel clarified that, while "[his] client is not pressed to sell the Monet," "[i]f this matter is to be settled, . . . [his] client would prefer to do so promptly." *Id.* Although he "d[id] not see that there is any basis for a claim against the work," he was "authorized . . . to begin discussions and to explore the possibility of reaching a practical resolution that is commensurate with the merits of Mr. Emden's claim." *Id.*

Two weeks later, on October 18, Stoetzel proposed that he and Plaintiffs' counsel meet when he "will be in New York from November 12 to November 14." *Id.* Juan Carlos forwarded this series of e-mails separately to Ms. Dugot and Mr. Simmons, asking both for "comme[n]ts" on the matter." *Id.*; Compl. Ex. DD. On October 22, Simmons wrote to Juan Carlos that he "cannot comment on the Monet case because the possessors are not working with Sotheby's." Compl. Ex. DD. Juan Carlos then forwarded Simmons' e-mail to Dugot with the message: "[S]o this sale will probably fall into your lap which makes me very happy!! Let us keep in touch!!" *Id.*

Around this time, Plaintiffs "retained an art expert to research the provenance of the Painting and the terms and conditions of its sale by Hans Erich." Compl. ¶ 19; *see also* Compl. Ex. FF. On November 14, 2018, the parties' attorneys met in New York. Compl. Ex. EE. After the meeting, Plaintiffs' counsel sent Defendants a detailed 11-page letter "review[ing] what [they] understand the facts and the law to be with respect to Juan Carlos Emden's potential claim to the [Painting], which is owned by the Estate of Adele Klapper[.]" *Id.* The letter began by thanking Defendants' counsel for their "candor at [the] meeting when [they] said that [they] did not yet know whether Mr. Emden has the basis to raise a claim against the Estate" and again acknowledged

7

that, "while the Estate may be willing to reach an accommodation with Mr. Emden, any such accommodation would need to be commensurate with the strength of the claim that Mr. Emden would seek to raise." *Id.*

The attorneys met again on February 20, 2019. Compl. Ex. HH. Prior to the meeting, Plaintiffs' counsel explained that "if we do reach an agreement, it is crucial that we have written confirmation from you: (1) identifying the heirs of Hans Erich . . . ; (2) that there are no other heirs other than those identified by you; (3) that you represent those heirs and (4) those heirs identified by you will be prepared to sign a compromise agreement, providing us with notarization and apostilles, as applicable." *Id.*

Several weeks after the meeting, Stoetzel e-mailed Plaintiffs' counsel, explaining that his clients "wish to minimize any further time and expense on this matter" and that:

> They feel that your recent discovery and sharing of the sales document by Ms. Olga Ammann has, to their belief, clarified the situation for the Klapper and Emden families. Therefore, it seems that there are no remaining issues regarding the provenance of the painting, in particular with regard to the Klapper family's ownership to it and Emden [Heirs] former possession. We appreciate having worked with you on this matter.

Compl. Ex. GG. Nonetheless, no agreement was reached and, according to Plaintiffs, Defendants have "declined to provide [them] with a signed statement" acknowledging that Mrs. Klapper owned the Painting. Compl. ¶ 22. "While he initiated no lawsuit," Plaintiffs allege that "Juan Carlos took steps to interfere in [their] attempts to sell the Painting." *Id.* ¶ 17. Specifically, Juan Carlos continued to contact both Ms. Dugot at Christie's and Mr. Simmons at Sotheby's, declaring that the Painting could not be auctioned unless and until he and his family received a financial benefit. Juan Carlos wrote to Mr. Simmons that "[Plaintiffs] cannot put this painting to the market as they state I should sign a 'release' of facts stated by their version of them." Winter Decl. Ex. 9. He wrote to Ms. Dugot that Plaintiffs "know the painting cannot be sold without a decent

compensation t[o] us!," Winter Decl. Ex. 23, and he emailed both Ms. Dugot and Mr. Simmons together insisting that the "painting CANNOT BE PUT FOR SALE until the Klappers of Washington , and the unscrupulous executors of the estate today , have a polite , decent and satisfactory compensation made to us the 3 sons of Max in Chile." Winter Decl. Ex. 24.

Finally, Plaintiffs sent Defendants a draft settlement agreement, containing a proposed settlement amount, a New York dispute resolution provision, and a provision consenting to jurisdiction in New York. Defendants forwarded this agreement to both Ms. Dugot and Mr. Simmons, asserting that the settlement amount offered by Plaintiffs was insufficient. Winter Decl. Exs. 3, 21, 26, 27.

During this same time period when Defendants and their agents were in conversations with Ms. Dugot and Mr. Simmons regarding the Painting, they were simultaneously engaged in separate discussions with both auction houses regarding the sale of two paintings by Bernardo Bellotto. Defendants and their attorneys engaged in extensive communications over the Bellottos with the New York auction houses, including by way of over 200 emails and at least fifteen phone calls and meetings, including two in-person meetings in New York with Christie's and Sotheby's employees. UF ¶¶ 51–67; Winter Decl. ¶ 2. Ultimately, the two paintings sold at auction by Sotheby's, with Defendants receiving at least $2.4 million under the sale agreement. UF ¶ 9. While the Bellottos were ultimately sold by Sotheby's, Plaintiffs allege that Defendants linked the sale of the Bellottos to their attempt to secure a settlement agreement regarding the Painting through emails to Christie's. Specifically, Defendants wrote to Ms. Dugot in an email discussing the Painting and the ongoing negotiations that he "[hopes] we can both come out nicely out of these 2 deals we have in front of us. For us the signature of a decent deal with Klappers and a great deal with the sale of the [two] Bellottos." Winter Decl. Ex. 21.

9

Plaintiffs filed this action on November 1, 2019, asserting *in rem* jurisdiction under 28 U.S.C. § 1655 and personal jurisdiction over the Defendants under C.P.L.R. § 302(a), New York's long-arm statute. In early 2020, the parties completed briefing on Defendants' initial motion to dismiss. On May 22, 2020, the Court held oral argument, and ultimately authorized jurisdictional discovery and deferred ruling on the motion. *See* Dkt. 33. Defendants filed the instant motion to dismiss for lack of personal jurisdiction in late July of 2021. Dkt. 88. In August of 2021, Plaintiffs filed their opposition brief, Dkt. 91, and Defendants filed their reply. Dkt. 94. On January 7, 2022, the Court ordered the parties to submit supplemental briefing addressing, *inter alia*, Plaintiff's contention that the Court has *in rem* jurisdiction.

## LEGAL STANDARD

*In rem* jurisdiction concerns a court's ability to determine title to, or the status of, property physically located within the court's jurisdiction. 28 U.S.C. § 1655 allows a federal district court, in a case "to remove any incumbrance or lien or cloud upon the title to, real or personal property within the district," to order a defendant who "cannot be served within the State, or does not voluntarily appear," to appear. *See Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 72 (2d Cir. 1998).[2] In contrast to *quasi in rem* jurisdiction, "[t]he essential function of an action in rem is the determination of title to or the status of property located—physically or legally—within the court's jurisdiction." 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1070 (4th ed. 2021).[3]

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

[3] *Quasi in rem* jurisdiction typically involves situations where the plaintiff is seeking monetary relief against the defendant, but because the court does not have personal jurisdiction over the defendant, the plaintiff seeks to attach or garnish property within the court's jurisdiction in order to satisfy the judgment. Wright & Miller, *supra* § 1070. Because the instant case concerns clearing title to a painting physically located within the Southern District of New York, this is a true *in rem* action rather than a *quasi in rem* action.

10

*In rem* jurisdiction is invoked "when one or more of the defendants or persons with potential claims to the property are nonresidents or jurisdiction over their person cannot be secured in the forum state. In this sense in rem . . . jurisdiction represents an alternative to in personam jurisdiction. The fact that the court cannot obtain jurisdiction over the person of all defendants or claimants to the property is considered irrelevant to whether in rem . . . jurisdiction is constitutionally permissible." *Id.*

When jurisdiction is based on property, the judgment can only affect that property. *See* Wright & Miller, *supra* § 1070. Accordingly, a court's judgment affecting the property will be binding on all persons who have an interest in the property. *Id.*; *see also, e.g.*, *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 198 F.3d 342, 349 (2d Cir. 1999). In other words, while a court cannot order injunctive or other relief against a defendant over whom it does not have personal jurisdiction, it can issue a declaratory judgment determining title to property in its district even if that defendant has an interest in such property.

In *Shaffer v. Heitner*, the Supreme Court held that the minimum contacts test established in the *International Shoe* case that governs personal jurisdiction should also be applied to *in rem* and *quasi in rem* actions. 433 U.S. 186, 207–08 (1977) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). There has been some debate about *Shaffer*'s application to various *in rem* actions. *See* Wright & Miller § 1072; *see also Mark E. Mitchell, Inc. v. Charleston Library Soc'y*, No. 00 Civ. 5725 (LAK), 2000 WL 1538663, at *1 (S.D.N.Y. Oct. 18, 2000). In *Johnston v. Arbitrium (Cayman Islands) Handels AG*, for instance, the Second Circuit stated that:

> If an *in rem* action is brought involving an out-of-state party's rights with respect to property in the forum state, . . . the forum court ordinarily has the power to decide the case insofar as it affects those rights, irrespective of whether there are sufficient contacts to confer on the court *in personam* jurisdiction over the party. *See Shaffer*

11

> *v. Heitner*, 43 U.S. 186, 207–08 (1977).  But if such contacts are absent, the existence of *in rem* jurisdiction alone does not permit the forum court to require such a party to appear in the forum or actively defend his or her interest in the property. Forcing this burden upon a party without minimum contacts with the forum state is precisely what is forbidden by *International Shoe* as "offen[sive] to traditional notions of fair play and substantial justice."  Such a party has the due process right simply to decline to appear, although he or she may default on, or have to suffer a defense provided by others on, the *in rem* claim as a result.

198 F.3d at 348–49.  Even had the Circuit not so interpreted *Shaffer*, the result here would be the same, because, for the reasons stated below, the minimum contacts test is satisfied.

The Supreme Court in *Shaffer* noted that its ruling applying the minimum contacts test to the *in rem* context would have substantial effects on *quasi in rem* cases: "For the type of quasi in rem action typified by *Harris v. Balk*[4] and the present case . . . accepting the proposed analysis would result in significant change."  433 U.S. at 208.  The Court, however, provided assurances that, in circumstances where claims to the property itself are the source of the underlying controversy, due process concerns will most likely be satisfied:

> This argument [that the minimum contacts standard must be satisfied for a court to assert jurisdiction over property], of course, does not ignore the fact that the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation.  For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction.  In such cases, the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest.  The State's strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction, as would the likelihood that important records and witnesses will be found in the State.

*Id.* at 207–08.

---

[4] *Harris v. Balk*, 198 U.S. 215 (1905), exemplified the *quasi in rem* action prior to *Shaffer*; there, a resident plaintiff was able to satisfy a claim against a nonresident defendant by garnishing the defendant's property that was unrelated to the plaintiff's claim, but located in the plaintiff's state.

12

"The fact that defendants assert claims to property within the forum indicates that they expect to benefit from the protection of the forum's laws." Wright & Miller, *supra* § 1072 (discussing *Shaffer*); *see also, e.g.*, *Spungin v. Chinetti Int'l Motors*, 515 F. Supp. 31, 33 (E.D.N.Y. 1981) (finding defendant's assertion of an interest in the property satisfied the minimum contacts rule for purposes of *in rem* jurisdiction).

## DISCUSSION

Plaintiffs brought this case pursuant to, *inter alia*, § 1655 seeking a declaration to remove a "cloud upon title" to the Painting. Compl. ¶¶ 1, 31, 34. Given that it is undisputed that the Painting is physically located within the Southern District of New York, *id.* ¶ 31, the only remaining question is whether the Court is satisfied that minimum contacts exist between Defendants and this District.

Plaintiffs argue that Defendants' consistent and extensive course of conduct in relation to the New York art market, including with respect to the Painting, is more than sufficient evidence to establish minimum contacts. As described in detail above, Defendants are active participants in the New York art market and have had extensive contact with New York, including through their repeated assertion of an ownership right to the Painting. These contacts are more than sufficient to satisfy any due process fairness concerns.

At oral argument, Defendants urged the Court not to exercise *in rem* jurisdiction because they claimed to have asserted their ownership right to the Painting exclusively within the context of settlement negotiations. The Court disagrees. As Plaintiffs rightly argue, the Emdens had asserted a claim to the Monet prior to Plaintiffs contacting them to settle any potential dispute. Indeed, they did so in the month before Plaintiffs' counsel first reached out to the Emdens on October 1, 2018. On September 4, 2018, while Plaintiffs were working with Christie's to auction

the Painting, Defendants' lawyers, Mr. Urbach and Mr. Stoetzel, spoke with Ms. Dugot on the phone. UF ¶ 48. Following that call, Mr. Urbach visited Christie's office in New York on September 17 for an in-person meeting with Ms. Dugot and Mr. Porter. *Id.* ¶ 49. These meetings led to Christie's informing Plaintiffs that the Emdens were asserting a claim to the Monet. Once Plaintiffs became aware of this potential problem, their attorney reached out to Juan Carlos Emden on October 1, 2018. In fact, it was Defendants' assertion of a claim to the Painting that was the impetus for Plaintiffs' counsel to contact them in the first instance. It was only after this point that any potential settlement discussions arose between the parties.

Defendants' ownership claim to the Painting, along with the "State's strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property," *Shaffer*, 433 U.S. at 208, support *in rem* jurisdiction here. As Section 1655 confers the power on the Court to determine ownership of property within the Court's jurisdiction, and because minimum contacts are satisfied here, the Court has jurisdiction to grant the requested relief.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied. Within one week, the parties shall submit a joint letter proposing next steps in this case. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 88.

Dated:   March 16, 2022
         New York, New York

Ronnie Abrams
United States District Judge